IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

VS.                                                    CRIMINAL NO.: 4:10CR20-DPJ-LRA

AUBREY BRENT STURDIVANT

MEMORANDUM OPINION AND ORDER

This criminal matter is before the Court on the post-trial motions of Defendant Aubrey

Brent Sturdivant for judgment of acquittal [209] or new trial [210].  Having fully considered the

premises, the Court finds that both motions should be denied.

I.        Facts/Procedural History

Sturdivant was charged in a superseding indictment on July 6, 2011, with having

conspired to defraud the United States in violation of 18 U.S.C. § 371.  Following Hurricane

Katrina, Sturdivant obtained a subcontract to remove debris in Wayne County, Mississippi.  The

project was funded by the United States with oversight by FEMA.  Although several contracts

existed, the operative one covered removal of what the parties referred to as "leaners" and

"hangers"—trees and limbs that were leaning or hanging in ways described by the contracts,

often into public rights of way.

After debris was cut, a county inspector would prepare a debris-removal ticket that tallied

the work.  The contract allowed payment of specified amounts for each cut tree or limb based on

the diameter of that tree or limb.  According to the Government, Sturdivant knowingly and

willfully conspired with others to defraud the United States by submitting inflated debris-removal tickets resulting in increased compensation under the contract.

After the Government's case in chief, the Court granted judgment of acquittal to county inspector Rita Giles.  Then, after more than three weeks of trial, the jury acquitted two additional inspectors, Valerie Shortridge and Laura Walley, as well as Sturdivant's older brother Shane Sturdivant.  A final alleged conspirator, county inspector Judd Johnston, pleaded guilty under a separate indictment and testified at trial against Sturdivant.

II.     Standards

Under Rule 29, the Court may set aside a jury's verdict of guilt if "the evidence is insufficient to sustain a conviction" of one or more of the offenses charged in the indictment. Fed. R. Crim. P.  29(a), (c).  The standard for reviewing a claim of insufficient evidence is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the evidence establishes the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Bellew*, 369 F.3d 450, 452 (5th Cir. 2004) (quoting *Jackson v. Virginia*, 43 U.S. 307, 319 (1979)).

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  But "[t]he grant of a new trial is necessarily an extreme measure."  *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).  Therefore, "motions for new trial are not favored, and are granted only with great caution."  *Id*. (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)).  "A new trial is granted 'only upon demonstration of adverse effects on substantial rights of a defendant.'"  *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997) (quoting *United States v. Cooks*, 52 F.3d 101, 103 (5th

Cir. 1995)).  An error affects the defendant's substantial rights if "it affected the outcome of the trial court proceedings." *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001); *see also United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (holding that "[t]he restitution order affected [the defendant's] substantial rights because the outcome of the district court proceedings would have been different if the error had not occurred").

Unlike when considering a motion for judgment of acquittal, the Court may weigh the evidence and assess the credibility of witnesses with respect to a motion for new trial.  *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997) (citing *Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982)).  "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  *Id.* at 1118.  And "'any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial.'"  *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright, et al., Federal Practice and Procedure § 556 (3d ed. 2004)).  Based on the applicable standards, the Court finds that neither acquittal nor a new trial is warranted in this case.

III.    Analysis

Sturdivant premises both motions on the same arguments.  In essence, he contends that the "evidence was insufficient" to sustain a conviction under Rule 29, Def.'s Mot. [209] at 1, or was so lacking in credibility and weight that "in the interest of justice a new trial should be granted" under Rule 33.  Def.'s Mot. [210] at 1.  He then attacks four specific categories of evidence as being unreliable:  (1) the expert testimony of Brooks Wallace; (2) a 2006 FEMA validation purporting to tally the number of trees for which compensation would have been proper; (3) FBI Special Agent James Grunwald's summary charts based on the 2006 FEMA

3

validation and the actual debris tickets; and (4) the testimony of alleged co-conspirator Judd

Johnston.[1]  Sturdivant's final two arguments are legal in nature, contending that he could not

conspire with Johnston because Johnston was a government informant and that the evidence at

trial varied from the charges in the Indictment.

This Order separately addresses the sufficiency arguments under Rules 29 and 33 and

examines the evidence Sturdivant attacks.  But review under Rules 29 and 33 is not limited to the

evidence Sturdivant chose to examine.  Instead, the Court considers the record as a whole and

determines whether it is sufficient to support the verdict under the legal standards applied to a

conspiracy conviction.

Starting with those standards, the jury found Sturdivant violated 18 U.S.C. § 371.  That

statute imposes criminal sanctions

> [i]f two or more persons conspire either to commit any offense against the United
> States, or to defraud the United States, or any agency thereof in any manner or for
> any purpose, and one or more of such persons do any act to effect the object of the
> conspiracy

---

[1]Neither Sturdivant's motions nor his memoranda expressly argues that the Court erred in admitting this evidence.  Nevertheless, Sturdivant does state that he should be allowed a new trial "without the improper" evidence.  Def.'s Mem. [213] at 25.  If Sturdivant intended to challenge admissibility, then the motion fails.  As an initial point, Sturdivant offers no legal analysis suggesting error as to any of this evidence.  And as to the specific items, first he withdrew his objection to the 2006 FEMA validation.  *See* Text Only Order 1/08/2013, withdrawing Def.'s Mot. 127.  Second, the summary chart was admissible under Federal Rule of Evidence Rule 1006 as a summary of the validation admitted without objection and the voluminous debris tickets in evidence.  *See United States v. Bishop*, 264 F.3d 535, 546–47 (5th Cir. 2001).  Third, inconsistency in Johnston's testimony goes to weight and would not sanction suppression.  Fourth, Brooks's expert testimony was admissible under Rule 702 for the reasons stated on the record.  Finally, even if error existed, the error would be harmless because excluding these items would not have changed the result given the incriminating statements Sturdivant made during recorded conversations.

18 U.S.C. § 371.  Thus, "[a] conviction under § 371 requires proof beyond a reasonable doubt of: '(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.'"  *United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012) (quoting *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010)).

Detrimental to many of Sturdivant's arguments, "[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."  *Iannelli v. United States*, 420 U.S. 770, 777 (1975).  "To be convicted of engaging in a criminal conspiracy, an individual need not know all the details of the unlawful enterprise . . . so long as he knowingly participates in some fashion in the larger objectives of the conspiracy."  *United States v. Brown*, 553 F.3d 768, 781 (5th Cir. 2008) (citation and quotation omitted).  "Once the government has produced evidence of an illegal conspiracy, it need only introduce 'slight evidence' to connect an individual defendant to the common scheme."  *United States v. Krenning*, 93 F.3d 1257, 1265 (5th Cir. 1996) (other internal quotation marks omitted).  Thus the question presented is whether the evidence establishes Sturdivant's knowing agreement with at least one other person to defraud the Government by inflating the load tickets and an overt act in furtherance of that objective. *Brown*, 553 F.3d at 781.

A.      Weight of the Evidence

1.      Rule 29

The evidence of an agreement begins with Judd Johnston.  Johnston's conduct triggered the FBI investigation, and he pleaded guilty to this same conspiracy in a related case.  According

to Johnston, Brent Sturdivant approached him and conspired to inflate the load tickets.  He described the fraud as including a scheme to claim more debris than could fit on the designated removal trailers.

Whether the contract allowed the subcontractors to claim debris that was cut but never hauled on the trailers was disputed in the record.  Sturdivant offered evidence that it did, a plain reading of the contact reveals that it did not, and Sturdivant's own statements in secretly recorded conversations with Johnston indicate his belief that debris had to be loaded to count.  For example, Sturdivant commented that the times reflected on the tickets showed "tree trucks in five minutes apart."  Ex. G-18(c) at 3.  Johnston later observed that this frequency looked bad, and Sturdivant agreed, "Yeah, it ain't gonna work like that."  Ex. G-18(c) at 26.  Regardless, Johnston also testified that tickets were padded by claiming fictitious trees that were never cut, conduct that is indisputably fraudulent.

Johnston's testimony was alone sufficient to reject a Rule 29 motion.  "As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict."  *United States v. Westbrook*, 119 F.3d 1176, 1189–90 (5th Cir. 1997) (citation omitted).  To find testimony incredible as a matter of law, it must "relate to facts that the witness[es] could not possibly have observed or to events which could not have occurred under the laws of nature."  *United States v. De La Rosa,* 171 F.3d 215, 221 (5th Cir. 1999) (citation and quotation marks omitted).  "Laws of nature" refers to facts or events that are impossible in a physical sense; not merely unlikely due to human nature.  *See United States v. Lindell,* 881 F.2d 1313, 1322 (5th Cir. 1989) ("Only when testimony

6

is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law.") (citation omitted); *see also United States v. Shaw*, 338 F. App'x 404, 408 (5th Cir. 2009) (holding that defendant "appears to confuse 'the laws of nature' with 'human nature'").

In this case, Johnston's testimony was often inconsistent about things such as the method of payment, the calculation of payment, the record of allegedly fraudulent conduct, the identity of the co-conspirators, *etc.*, but with respect to his testimony that he agreed with Sturdivant to defraud the United States—the core element of the conspiracy charge—he was certainly in a position to observe those events, and the testimony does not violate the laws of nature. Thus Johnston's testimony was competent under Rule 29 to establish an agreement to defraud.

Finally, even if Johnston's testimony could be entirely disregarded, it was not the only evidence of guilt. As discussed more fully below, the jury heard substantial evidence of an unlawful agreement between Johnston and Sturdivant—much of which came from Sturdivant's own statements in secretly recorded conversations with Johnston. And while Sturdivant offers his own interpretation of that evidence, under Rule 29, "[t]he evidence need not exclude every reasonable hypothesis except that of guilt." *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) (citation omitted). Sturdivant presented his evidence to the jury, it was rejected, and there was sufficient evidence to support that conclusion.

> 2.    Rule 33

Under Rule 33, the Court may weigh the credibility of the witnesses, and it is apparent that Johnston's credibility was lacking. But a jury could reasonably credit his core statement that he and Sturdivant agreed to defraud the United States. Moreover, it appears to the Court, after

hearing weeks of evidence, that Johnston's testimony was not determinative.  Instead, Sturdivant's recorded conversations with Johnston appear to have been the deciding factor.  It was this evidence that the Government pounded during its closing argument, and when considered in conjunction with all other evidence, the Court concludes that the proof is sufficient to deny a new trial.  The Court will address some of that evidence but will not offer a catalog of the proof.

To begin with, the jury heard the raw number of claimed trees and that the numbers claimed by Sturdivant's crews dwarfed all other subcontractors in Wayne County.  That fact standing alone would not support the verdict, but it is probative of an effort to inflate the claims.  Sturdivant offered several explanations for this disparity both during the investigation and at trial.  But his conversations with Johnston after the project ended suggest that the explanations he gave investigators were contrived.  For example:

- Sturdivant told Johnston on one video that if investigators ask him how they reported so many trees, Johnston should say they "pulled 'em up stumps and all . . . .  So that's going to be our defense." Ex. G-18(c) 24–25.

- Later during the same conversation, Sturdivant again appears to search for an explanation, this time stating that he had better equipment:  "Uh uhh, well how'd you do that . . . well, I mean, tell me how to do, I had a skidder.  That's my, that's what I'm saying." *Id*. at 38.  He then recalls his comments to the investigators, stating, "Uhh, better equipment and all kinds of stuff, just whatever I could think of." *Id*. at 39.  "[W]e got some other things we gonna add in like better equipment, more hands, more, I mean, we got all, that." Ex. G-19(b) at 13.

- Sturdivant also stated on several occasions that they should play stupid.  For example, he told Johnston, "we keep, we're stupid.  I mean, (UI) say if we just gon' be stupid.  I mean, there ain't no other way around it." Ex. G-19(b) at 7.  "Well, we've thought about that and what, and what everybody could, if we had set down everybody and tried to explain it, but somebody's gonna forget and say somethin' different.  So the best thing for us to do is just the stupid routine." Ex. G-19(b) at 12.

These statements offer further support for the verdict because efforts to deceive investigators can reasonably be viewed as "mask[ing] an underlying consciousness of guilt." *United States v. Diaz–Carreon*, 915 F.2d 951, 954–55 (5th Cir. 1990).

In addition to these comments, Sturdivant made other inculpatory statements suggesting his concern that somebody would "be spilling it." G-18(c) at 31. He said the same thing in a separate conversation: "The only way anybody gonna (UI) trouble is somebody rats on somebody else to keep somebody out of trouble." Ex. G-19(b) at 7. "They can't, I mean, think about it. The only way, there's only one way that *we gon' get caught*." Ex. G-19(b) at 32 (emphasis added). "One way, if somebody verbally says . . . we can beat this, we can beat this shit in court. With the right lawyers, we could beat this. We can't beat somebody sittin' there sayin', listen yeah, he give me fifty dollars, (UI) (says CW's name), (says CW's name) helped me merry the tickets and we went to jail (UI). That that's how we gon', that's how we gon' get busted." Ex. G-19(b) at 32.

Other comments from Sturdivant seemed even more incriminating. For example, when asked if others were involved, Sturdivant responded, "uhh, there's a lot of others involved." Ex. G-18(c) at 29. Sturdivant also appeared to know his conduct was unlawful and could lead to prison for Johnston and himself: "Look how much money they spent to catch us." Ex. G-19(b) at 22. "If they wanted to get us, well, lord, they could." Ex. G-19(b) at 27. "They [FEMA] knew that some money was comin' back to 'em or somebody's ass is goin' to jail." Ex. G-19(b) at 22. "[T]he only people that's really goin' down for this thing is gonna be me. Honestly (UI) Daddy ain't gonna do it. He didn't have nothin' to do with it . . . . The only other person that might go would be you [Johnston]." Ex. G-19(b) at 28.

Sturdivant's motion offers a different interpretation for his comments, as he did at trial. But viewing these statements as incriminating would not be unreasonable, especially in light of the other evidence the jury heard.  For example, Sturdivant paid Johnston thousands of dollars even though Johnston was a county inspector who should not have received any benefits from the subcontractors he monitored.  Johnston's bank records reflect deposits of $3,000; $4,460; $3,380; $1,500; and $4,500 attributed to Sturdivant.  *See* Ex. G-12.  Brent Sturdivant also states on tape that Johnston made "seventy or better" from Katrina.  Ex. G-18(c) at 30.  And Sturdivant is seen handing Johnston $200 when asked for money and promising to deliver approximately $800 the next day, which he did.  A final check from Sturdivant's company to Johnston is even more suspicious.  That check, totaling $4,000, is marked "FOR" "Antique Buggy & acc."  *See* Ex. G-14.  Yet the jury heard undisputed testimony that Johnston sold no such item.  Sturdivant offered explanations for the payments, but a reasonable juror could easily reject them and view these payments as corroborating Johnston's testimony that an agreement existed between the two.

The jury also watched a recorded conversation between Sturdivant's older brother Shane and Johnston.  Though Shane was acquitted, he agreed in the conversation that Johnston was still owed "somewhere around" $14,000.  Ex. G-15(c) at 2–3.  Shane tells Johnston he needs to discuss the payment with Brent, and the next day Brent called Johnston about the money.  Ex. G-17(b) at 4.[2]

_____

[2]While the cold words reflected in these recorded conversations are incriminating, the totality of the evidence includes the tone and body language shown on the videotapes.  A reasonable juror could easily conclude that this conversation with Shane—as well as those with Brent—did not relate to legitimate payments.

Aside from the raw number of cuts, Johnston's testimony, the recorded conversations, and the payments to Johnston, the jury also heard evidence related to the 2006 FEMA validation which was summarized with other evidence in the charts Sturdivant disputes.  After the removal was completed, FEMA returned to Wayne County to validate the number of trees that were actually cut.  Teams of validators counted stumps and holes, marking what they found with spray paint. Valid stumps—those for which compensation was allowed by contract—were marked in green, invalid stumps (such as stumps cut before Katrina or found outside the designated area) were marked in red.  The FEMA validation concluded that even if you counted the invalid stumps as valid, Sturdivant's company claimed nearly 11,500 more trees than were actually cut. *See* Ex. G-42(a).

Sturdivant disputed the validity and thoroughness of the 2006 FEMA validation at trial and raises those same arguments now.  But the evidence was sufficient for a reasonable jury to conclude that the validation, even if not perfect, still reflected disparity.  The most damning evidence on this point again comes from Sturdivant himself.  After FEMA concluded its validation, Sturdivant apparently visited the areas it validated.  His candid statements belie his argument that FEMA missed trees:

- "Drive thru Beat 2 [Sturdivant's territory].  Ain't a road on it that ain't got green paint all over it.  Not a road." Ex. G-19(b) at 6.  "Oh, no, not ev, not *about* every road.  Every road.  They ain't a road that don't have green paint on it in Beat 2." Ex. G-19(b) at 22 (emphasis added).

- "But they didn't miss shit, (says CW's name).  You ought to seen the shit they found on the side of them road.  They (UI) dead ass stumps been dead for five years, they sprayed 'em, (UI)." Ex. G-19(b).[3]

_____

[3]This statement is significant because Special Agent Griswald testified that for purposes of evaluating the extent of the alleged fraud, the Government subtracted the total number of valid

- He continued, "They didn't miss shit.  You know, that's the thing, that's, you know, I went back through and said maybe they just didn't look (UI).  But them son of a bitches didn't miss a damn thing."  Ex. G-19(b) at 21.  "They didn't miss shit; they went down every road; act dumb; tell them it came from the woods; etc."  Ex. G-19(b) at 21; *see also* G-19(b) at 22.

In another attack on the 2006 FEMA validation, Sturdivant claims that a subsequent validation supports the validity of his tickets.  After Hurricane Katrina hit, Wayne County hired Geoffrey Clark as the project manager for the clean up.  In March 2007, after the project ended and the FEMA validation was produced, Clark worked with MEMA to conduct another validation.  That validation started with the numbers FEMA recorded for the main roads, but it then added large numbers of trees found on what Clark described as ancillary roads and private property that was entered pursuant to a right of entry (ROE).  According to Clark, had FEMA included the ancillary roads and the ROE cutting, the numbers Sturdivant claimed in Beat 2 would have been confirmed.

But again the evidence conflicted.  First, the Government offered proof that when determining the disparity between cuts and claims, FEMA did not include the claims for ancillary roads and ROE work.  In other words, the Government had merely compared the main road cuts against the main road stumps, so Clark's validation compared "apples to oranges."  Second, Sturdivant made several statements indicating that Clark was working with him to disprove the FEMA validation.  Ex. G-19(b) at 22 (stating that Clark "was really just tryin' to help us, tryin' to find some road that we had been down");  Ex. G-18(c) at 40 ("They're trying to make county roads out of driveways over there.").

---

*and* invalid cuts from the number of cuts Sturdivant claimed.  In other words, when determining how much Sturdivant exaggerated what was cut, he was given credit for trees that should not have counted, including trees cut long before Katrina.

In sum, the jury was offered two reasonable yet contradictory interpretations of the 2006 FEMA Validation.  And even if the jury accepted some of Sturdivant's arguments and found that the disparity between claimed and cut trees was lower than FEMA found, it would still be within its province to conclude that a disparity remained.  And that finding would support the verdict that an agreement had been made to defraud.[4]

The only other evidence Sturdivant directly attacks in his post-trial motions is the expert testimony of Brooks Wallace.  Wallace testified that based on his calculations, many of the debris tickets reflected volumes of debris that could not fit on a single truck.  He was not the only witness to make this statement, and he expressly denied holding any opinion regarding fraud. According to Sturdivant, "Wallace's opinions were devastating" to his case.  Def.'s Mem. [213] at 4.  Yet during trial, Sturdivant embraced the core opinion that the debris surpassed the trucks' capacity.  Counsel asked Wallace, "Would it surprise you to learn that the defendant Brent Sturdivant doesn't contest that fact?"  The testimony was properly admitted for the reasons given on the record at trial, but even if it was received in error, any error would be harmless given Sturdivant's agreement with the witness's key opinion.

The Court has not attempted to catalog all of the evidence received during three weeks of testimony.  But the evidence discussed above is sufficient to sustain the verdict.  As noted previously, the Court may weigh evidence under Rule 33, but granting a new trial represents "an extreme measure . . . ."  *O'Keefe*, 128 F.3d at 898.  Here, the jury heard conflicting evidence and

---

[4]Sturdivant also contests the accuracy of the summaries that were based on this validation.  But the Government provided Sturdivant with copies of the summaries in compliance with Rule 1006 of the Federal Rules of Evidence, and he had an opportunity to cross examine the witness regarding them.  His arguments regarding the charts go to weight, and even if believed, the jury's verdict would still withstand Rule 33 scrutiny based on the other evidence.

concluded that Sturdivant conspired to defraud the United States.  Viewing the evidence as a whole, it does not preponderate so "heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  *Robertson*, 110 F.3d at 1117.

> B.   Conspiracy with a Government Informant

Sturdivant also makes the legal argument that he could not conspire with Johnston because the latter was a government informant.  Def.'s Mem. [213] at 22 (citing *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965)).  Defendant's reliance on *Sears* is misplaced.  In *United States v. Delgado*, the Fifth Circuit explained *Sears* as holding that "in appropriate circumstances the district court should instruct the jury that an 'agreement' with a government agent cannot be the basis for a conspiracy conviction *because a government agent does not share the accused's criminal purpose*."  672 F.3d 320, 341 (5th Cir. 2012) (emphasis added) (*citing Sears*, 343 F.2d at 142 ("[A]s it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy.")).

This rule has no application here.  When the alleged conspiracy occurred, Johnston had not yet been caught and still shared the accused's criminal purpose.  *See United States v. Tanner*, 628 F.3d 890, 906 (7th Cir. 2010) (explaining that *Sears* applies if defendant conspires with an informant "during the time when [the informant] was a government informant"); *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986) (same).  And even if *Sears* did apply, Sturdivant requested no *Sears* instruction and did not pursue that defense at trial.  *Cf. United States v. Romero*, 282 F.3d 683, 689 (9th Cir. 2002) ("[A] district court's failure to offer a *Sears* instruction *sua sponte* is not plain error, when a defendant does not rely on a *Sears*-type defense theory at trial.").

14

C.     Variance

Sturdivant filed a supplemental memorandum on the eve of sentencing in which he asserted inconsistencies in Johnston's testimony.  *See generally* Def.'s Supp. Mem. [219].  Near the end of this short submission, Sturdivant added that the "Government's best case for the object of the conspiracy and when it began is inconsistent with the indictment and the money paid to Judd prior to December 5, 2005 had no connection to [sic] charge in the indictment."  *Id.* at 3.  This alleged inconsistency led the Court to ask during the first phase of the sentencing hearing whether Sturdivant was asserting a variance.

Variances occur "when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense."  *United States v. Delgado*, 401 F.3d 290, 295 (5th Cir. 2005).  The Court must compare "the evidence presented at trial with the language of the indictment."  *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (citation omitted).  "If a variance did occur, we reverse only if the variance prejudiced the defendant's substantial rights."  *Id*.

While it was not entirely clear during the hearing that Sturdivant originally intended a variance argument, counsel did offer three potential issues when pressed on the subject:  (1) the alleged November start date of the conspiracy was incorrect because the conspiracy, assuming there was one, began in December; (2) the Indictment stated that load tickets were falsified because Defendants counted debris that was never loaded on the trucks but Johnston testified that co-conspirators also padded tickets to reflect debris that was never cut; and (3) Johnston's pretrial statements differed from his trial testimony regarding the details of the conspiracy.  The Court will examine each argument.

15

1.     Date Conspiracy Began

Paragraph 4 of the Superseding Indictment charges that "[b]egining in or about November 2005 and continuing to in or about December 2006 . . . the defendants . . . did knowingly and willfully conspire . . . ."  Sup. Ind. ¶4.  According to Sturdivant, the Indictment incorrectly charges that the conspiracy began in November when in reality it began in December—if at all. He claims that this constitutes a prejudicial variance.

There was no variance on this issue because the substantial evidence supported the finding of a conspiracy—that is an agreement—beginning in or around November 2005.  And even if it began in December 2005, the difference between "in or around November" and December is not material.  *Girod*, 646 F.3d at 316–17  (holding that four month difference in date offense began and date reflected in indictment was not material) (citing *United States v. Wilson*, 116 F.3d 1066, 1089 (5th Cir. 1997) (holding that "[a] five-month variance between the date alleged and the date proved is not unreasonable as a matter of law as long as the date proven falls within the statute of limitations and before the return of the indictment")).

Sturdivant likewise fails to show an affect on his substantial rights because the Government charged conduct beginning "in or around November"; Sturdivant suggests a date just one month later; and the Superseding Indictment adequately described the nature of the conspiracy to place Sturdivant on notice.  *Id.* at 317 (finding incorrect date in indictment had no effect on defendant's substantial rights where he was on adequate notice).  Accordingly, any discrepancy in the dates does not merit a new trial.[5]

----

[5]Sturdivant does not argue that the dates constitute a constructive amendment, but even if he had, "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, within reasonable limits, proof of any date before the return of the

16

2.      Object of Conspiracy

Sturdivant contends that proof regarding the way the conspiracy was carried out did not match the charges in the Superseding Indictment.  The Superseding Indictment charged a conspiracy to defraud the United States by "signing false load debris tickets misrepresenting that certain types and amounts of debris were removed . . . and loaded onto trucks when in truth and fact, . . . [Defendants] knew that certain types and amounts of debris were not removed . . . and loaded onto trucks."  Sup. Ind. ¶ 5.

At trial, the Government offered evidence that under the operative contract, debris had to be loaded and hauled before it could be counted for compensation.  While the jury heard testimony that this requirement was often ignored, a plain reading of the contract supports the Government's position.  Johnston and the Government's rebuttal witnesses concurred, testifying that the debris had to be loaded on trucks to be counted.  But Johnston also added that tickets were padded by claiming debris that was never cut.

In the conspiracy context, "[a] reversal based on variance between indictment and proof requires two findings: (1) that the evidence at trial actually proved two separate conspiracies, and (2) that the variance affected a substantial right of the appellant."  *United States v. Franklin*, 148 F.3d 451, 459 (5th Cir. 1998) (citation omitted).  In this case, the proof did not materially vary from the Indictment because either theory still fits within the Superseding Indictment's charge that the debris was claimed on load tickets though it was not removed and loaded.  In other words, whether the trees were ever cut, under either scenario they were not removed and loaded.

indictment and within the statute of limitations is sufficient."  *Id*. at 316 (multiple citations omitted).

*See United States v. Morrow,* 177 F.3d 272, 291 (5th Cir. 1999). And in any event, the charge and the proof point to a single conspiracy. *Id*. (providing test for determining whether Government proved more than one conspiracy).[6]

But even if a variance occurred, there was no impact on Sturdivant's substantial rights. "When the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." *Id*. (citation and quotation omitted). The Government adequately proved Sturdivant's agreement with Johnston to defraud the United States by submitting false debris tickets.

3.      Differences Between Johnston's Testimony and Pre-Trial Statements

Sturdivant contends that Johnston's testimony differed from his pre-trial statements. As an initial point, such inconsistencies would not amount to a material variance because they relate to matters not specifically addressed in the Superseding Indictment. *Girod*, 646 F.3d at 316 (noting that the court compares "the evidence presented at trial with the language of the indictment" (citation omitted)).

And to the extent this argument is better framed as an attack on the weight of the evidence, it fails for two more reasons. First, as discussed above, Johnston's testimony was not the only proof of guilt. While the jury could have easily rejected many of his statements, the core testimony regarding an agreement matched Sturdivant's comments during the videotaped conversation with Johnston. Second, many of the records that Sturdivant now offers to support

---

[6]The theory that the scheme included debris that was never cut should not have been a surprise because that was the conclusion of the hotly disputed 2006 FEMA validation.

his argument were never mentioned during trial.  The Court agrees with the Government that when weighing the evidence under Rule 33, it should weigh the same evidence presented to the jury.  Plus, considering this additional evidence would gut the carefully crafted rules for considering newly discovered evidence in the Rule 33 context.  *Cf. United States v. Franklin*, 561 F.3d 398, 405 (5th Cir. 2009) (providing elements for new trial under Rule 33 based on newly discovered evidence); *see also United States v. Gharbi*, 347 F. App'x 997, 998 (5th Cir. 2009) (affirming denial of new trial based on additional evidence "[b]ecause [defendant] failed to demonstrate that the evidence at issue is newly discovered"); *United States v. Villarreal*, 324 F.3d 319, 326 (5th Cir. 2003) (affirming denial of Rule 33 motion because evidence was not new).

IV.    Conclusion

The Court has fully considered all arguments.  Those not addressed in this Order would not change the result.  For the reasons stated, the Court finds that the Motion for Judgment of Acquittal [209] and Motion for New Trial [210] should be denied.

**SO ORDERED AND ADJUDGED** this the 5th day of September, 2013.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE